UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

No. 10 Civ. 7992 (RJS)

DONNA ANN GABRIELE CHECHELE,

Plaintiff,

VERSUS

W. EDWARD SCHEETZ AND MORGAN HOTEL GROUP CO.,

Defendants.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/30/11

OPINION AND ORDER
August 29, 2011

RICHARD J. SULLIVAN, District Judge:

Plaintiff Donna Ann Gabriele Chechele brings this suit against Defendant W. Edward Scheetz, the former President and CEO of nominal Defendant Morgans Hotel Group Co. ("Morgans" or the "Company"), seeking to recover short-swing profits pursuant to Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b). Now before the Court is Defendant Scheetz's motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted.

## I. BACKGROUND[1]

Plaintiff is a New Jersey resident and shareholder of nominal Defendant Morgans (Compl. ¶ 3), a Delaware corporation with its principal offices in New York (id. ¶ 4). Defendant Scheetz is the former president and CEO of Morgans, as well as the co-founder, co-chairman and co-CEO of NorthStar Capital Investment Corp. ("NorthStar"), a Maryland corporation formed "for the purpose of investing in debt

---

[1] The following facts are derived from the Complaint. In resolving the instant motion, the Court has also considered Defendant's Memorandum of Law in Support of the Motion to Dismiss ("Def.'s Mem."), Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss ("Pl.'s Opp'n"), and Defendant's Reply Memorandum of Law in Support of the Motion to Dismiss ("Reply"), as well as the various exhibits and declarations attached thereto.

and equity interests in real estate assets and businesses." (*Id.* ¶ 5, 10(ii).)

Scheetz was allegedly a member of a shareholder "group" as defined in Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), 17 C.F.R. § 240.13d-5(b)(1). (*Id.* ¶ 10.) In addition to Scheetz, that group allegedly included (1) NorthStar; (2) David Hamamoto, a business partner of Scheetz and current chairman of Morgans, as well as co-founder, co-chairman, and co-CEO of NorthStar; and (3) Marc Gordon, a business partner of Scheetz and Hamamoto, current president of Morgans, and former vice president of NorthStar. (*Id.*) The shareholder group allegedly arose from a series of "express or implied" agreements for the purpose of acquiring, holding, voting, or disposing of Morgans common stock. (*Id.* ¶ 11.) These agreements allegedly included (1) a "Control Agreement"; (2) "Lock-Up Agreements"; (3) "Registration Rights Agreements"; (4) "NorthStar Agreements"; and (5) "Other Agreements." (*Id.*) According to the Complaint, the members of the alleged shareholder group beneficially owned more than 10% of the outstanding shares of Morgans common stock, thereby subjecting Scheetz to Section 16(b) liability for his sales of Morgans stock within the six-month short-swing period. (*Id.* ¶¶ 12-13, 15-16.)

Plaintiff commenced this action by filing a Complaint on October 20, 2010, seeking to recover no less than $3,500,000 in short-swing profits allegedly realized and retained by Scheetz in violation of Section 16(b). (*Id.* ¶ 18.) Scheetz moved to dismiss on January 14, 2011, and the motion was fully submitted as of February 7, 2011.

## II. LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). By contrast, a pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III. DISCUSSION

"Section 16(b) of the Exchange Act requires that any profits derived from short-swing trading be disgorged to the issuer of the stock." *Morales v. Quintel Entm't*, 249 F.3d 115, 121 (2d Cir. 2001). Short-swing trading is generally defined as "the purchase and sale (or vice versa) of a company's stock within a six-month period by persons deemed to be 'insiders' . . . ." *Id.* Designed to "curb the evils of insider trading," *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972), Section 16(b) provides, in relevant part:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement . . . involving any such equity security within any period of less than six months, . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months..

15 U.S.C. § 78p(b). Thus, Section 16(b) imposes strict liability on insiders, including officers, directors, and beneficial owners of more than 10% of a company's securities, who realize short-swing profits. *See Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*, 522 F.3d 242, 244 (2d Cir. 2008).

Although "[t]he Exchange Act does not define the term 'beneficial owner' as it is used in § 16(b)," regulations promulgated by the SEC in 1991 "creat[ed] a two-tiered analysis of beneficial ownership." *Morales*, 249 F.3d at 122. SEC Rule 16a-1(a)(1) provides that "[s]olely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities," the term "beneficial owner" means, with exceptions not pertinent here, "any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder." 17 C.F.R.

§ 240.16a-1(a)(1). The borrowed definition from SEC Rule 13d-5(b)(1), promulgated under Section 13(d), provides, in relevant part:

> [W]hen two or more persons agree to act together *for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership* . . . of all equity securities of that issuer beneficially owned by any such persons.

17 C.F.R. § 240.13d-5(b)(1) (emphasis added). Accordingly, under Section 13(d) and the corresponding regulations, "if two or more entities agree to act together for any of the listed purposes, a 'group' is 'thereby' formed." *Roth v. Jennings*, 489 F.3d 499, 507-08 (2d Cir. 2007).

In this case, it is undisputed that Scheetz did not personally own more than 10% of Morgans stock. Rather, Plaintiff alleges that "[b]y virtue of his membership in the . . . Shareholder Group, Defendant W. Edward Scheetz was deemed, at all relevant times, to have beneficially owned in excess of 10% of the outstanding shares of the common stock of [Morgans]." (Compl. ¶ 13.) The alleged shareholder group is the subject of this motion to dismiss, which presents a single question: does the Complaint contain "factual content" sufficient to permit the Court to "draw the reasonable inference" that a Section 13(d) group existed? *Iqbal*, 129 S. Ct. at 1949. For the reasons that follow, the Court concludes that it does not.

A.  "Control Agreement"

Plaintiff alleges that the shareholder group arose from a series of five agreements entered and executed "for the purpose of

acquiring, holding, voting, or disposing of [Morgans] securities." (Compl. ¶ 11.) The first and most contested agreement is the alleged "Control Agreement" between Scheetz, Hamamoto, Gordon, NorthStar and one or more Morgans creditors. (*Id.* ¶ 11(i).) The Complaint alleges that, on or about October 6, 2006, the foregoing parties "agreed that they or their affiliates would maintain control of nominal Defendant [Morgans] by . . . holding and, if necessary, acquiring shares of the common stock of nominal Defendant [Morgans] in an aggregate amount in excess of specified thresholds." (*Id.*) The Complaint further alleges upon information and belief that the Control Agreement was reaffirmed as amended on November 10, 2006, January 8, 2007, October 10, 2007, January 16, 2008, August 5, 2009, and remains in full force and effect. (*Id.*)

As previously noted, factual allegations are presumed true on a motion to dismiss – but mere conclusions are not. *See Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Where, as here, a claim is premised on the existence of an agreement, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. While the facial plausibility of the alleged shareholder group does not turn on the existence of a *particular* agreement, bare allegations that the parties "agreed that they . . . would maintain control of [Morgans]" will not, without more, suffice. (Compl. ¶ 11(i).) *See Iqbal*, 129 S. Ct. at 1949 (holding that a pleading that only "offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do"); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 319 n.2 (2d Cir. 2010) ("The allegation that defendants agreed . . . is obviously conclusory, and is not accepted as true.").

Faced with these deficiencies, Plaintiff attempts to bolster the plausibility of an alleged Control Agreement by pointing to the contents of a credit agreement between Morgans and certain lenders unrelated to this action (the "Credit Agreement"). The Credit Agreement, which is attached in part to the motion papers but not referenced in the Complaint, provides that an "Event of Default" will occur if Morgans undergoes a "Change in Control." (Decl. of Keenan D. Kmiec, Jan. 31, 2011, Doc. No. 24 ("Kmiec Decl."), Ex. E.) Among the four circumstances that constitute a Change in Control under the Credit Agreement are two that pertain to the Morgans stock ownership of the "Permitted Investors," including Scheetz, Hamamoto, Gordon, and NorthStar.[2] (*Id.*) Plaintiff strains to link the Credit Agreement with the alleged Control Agreement in its opposition papers, arguing that "[t]he terms of the Credit Agreement would be difficult to satisfy without the Control Agreement." (Pl.'s Opp'n 11.) Thus, "[b]ecause the Company's continuing compliance with its obligations under the Credit Agreement depended on such an agreement," Plaintiff concludes that "it is reasonable to infer that the Control Agreement existed." (*Id.* at 12.)

The inference Plaintiff urges the Court to adopt crucially depends on the terms of the Credit Agreement, which Plaintiff contends is "integral" to the Complaint and therefore properly before the Court. (Pl.'s Opp'n 14.) On a motion to dismiss, "the court may consider any written instrument attached to

---

[2]  Under subsection (b) of the Credit Agreement, a Change in Control would occur if "any Person or group" acquired more than 40% of Morgans stock while the Permitted Investors owned a lesser percentage. (Kmiec Decl., Ex. E.) Under subsection (d) of the Credit Agreement, a Change in Control would occur if "any Person or group other than the Permitted Investors" acquired direct or indirect control of Morgans. (*Id.*)

the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Matson v. Bd. of Educ.*, 631 F.3d 57, 62 (2d Cir. 2011) (citing *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).   A document is considered "integral" to the pleadings only where the plaintiff (1) has "actual notice" of the extraneous information and (2) relied upon the document in framing the complaint. *DeLuca v. AccessIT Group, Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (internal citations and quotation marks omitted). "[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  In this case, Plaintiff clearly fails to satisfy the second prong of the "integral" document test, since the Complaint does not reference the Credit Agreement, much less "rel[y] heavily upon its terms and effect." *Id.*

Plaintiff argues in the alternative that the Credit Agreement is properly before the Court as a "legally required public disclosure document[] filed with the SEC." *ATSI Commc'ns*, 493 F.3d at 98.  Although it appears that the Credit Agreement was filed with the SEC (Kmiec Decl. 2), the Court may consider regulatory filings "only to determine *what* the documents stated," and "*not to prove the truth of their contents*." *Jennings*, 489 F.3d at 509 (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *accord Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (holding that on a motion to dismiss, "it is proper to take judicial notice of the *fact* that . . . regulatory filings contained certain information,

without regard to the truth of their contents").  Thus, although the Court may take judicial notice of the Credit Agreement, it declines to credit the truth of its contents or to import its terms wholesale into the Complaint.  Accordingly, the Court finds neither the Credit Agreement nor the alleged Control Agreement sufficient to support the "reasonable inference" of Section 13(d) group conduct. *Iqbal*, 129 S. Ct. at 1949.

### B. Lock-Up Agreements

Plaintiff further argues that the existence of the alleged shareholder group is demonstrated by a series of Lock-Up Agreements entered "[f]rom time to time since February 2006" and executed "for the purpose of holding and disposing of" Morgans securities.  (Compl. ¶ 11(ii).) According to the Complaint, Scheetz, Hamamoto, Gordon, and NorthStar each entered "one or more" Lock-Up Agreements with "one or more" underwriters, by which they agreed "to hold securities issued by [Morgans] for a specified period of time and not to dispose of such securities without the consent of such underwriters."  (*Id.*) Plaintiff argues that the foregoing Lock-Up Agreements "permit a reasonable inference" that members of the alleged shareholder group "engaged in coordinated activity." (Pl.'s Opp'n 21.)

The primary flaw with such an inference, of course, is that the alleged members of the shareholder group were parties to separate Lock-Up Agreements. Under SEC Rule 13d-5(b)(1), a "group" is formed only "[w]hen two or more persons *agree to act together* for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer . . . ."  17 C.F.R. § 240.13d-5(b)(1) (emphasis added). But according to Plaintiff's own allegations, each member of the alleged group entered

into "one or more" separate Lock-Up Agreements with "one or more" Morgans underwriters – not with each other. (*See* Compl. ¶ 11(ii).)

In the absence of a lock-up agreement between the members of the alleged shareholder group, Plaintiff argues that any Lock-Up Agreement signed by NorthStar demonstrates "group activity" because members of the alleged shareholder group "controlled NorthStar and used it as an investment vehicle for the Company's common stock." (Pl.'s Opp'n 20.) But the Complaint includes no allegation regarding the use of NorthStar as an "investment vehicle" for Morgans stock. Instead, the Complaint simply characterizes NorthStar as "a Maryland corporation that was formed for the purpose of investing in debt and equity interests in real estate assets and businesses." (Compl. ¶ 10(ii).) Based on the scant allegations contained in the Complaint, the Court cannot conclude that the existence of a Lock-Up Agreement between NorthStar and one or more Morgans underwriters supports the requisite inference of group conduct within the meaning of Section 13(d).

Plaintiff argues in the alternative that the similarity of the various Lock-Up Agreements gives rise to an inference of coordinated activity. Although Plaintiff correctly observes that the formation of a shareholder group "may be formal or informal," *Morales*, 249 F.3d at 124, "[t]he touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective," *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, --- F.3d ---, 2011 WL 2750913, at *5 (2d Cir. July 18, 2011) (internal citations and quotation marks omitted). In *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115 (2d Cir. 2001), the Second Circuit

recognized lock-up provisions as supplemental evidence of a "mutual agreement." *Id.* at 126. In the absence of additional evidence, however, other courts have rejected allegations of group conduct based solely on the existence of parallel lock-up agreements with a third party. *See Donoghue v. Accenture Ltd.*, No. 03 Civ. 8329 (NRB), 2004 WL 1823448, at *4 (S.D.N.Y. Aug. 16, 2004) ("[T]here can be no 'common objective' where, as here, an 'agreement' is imposed on employees by the company.").

In any event, Plaintiff appears to concede that the Lock-Up Agreements, standing alone, are not enough to allege the existence of a shareholder group. (*See* Pl.'s Opp'n 21.) The Court agrees. Because the plausibility of a group inference based on the Lock-Up Agreements stands and falls with the factual content of the supporting allegations, the Court proceeds to consider the remaining agreements at issue.

C. Registration Rights Agreements

Plaintiff's allegations with respect to the "Registration Rights Agreements" are similarly deficient. The Complaint alleges that, "[f]rom time to time since February 2006," Scheetz, Hamamoto, Gordon, and NorthStar entered "one or more" express or implied agreements with Morgans "for the purpose of disposing of" Morgans securities. (Compl. ¶ 11(iii).) The Complaint further alleges that, pursuant to the Registration Rights Agreements, Morgans "agreed to seek registration under the Securities Act of 1933 . . . for the purpose of facilitating the unrestricted disposition of securities" held by Scheetz, Hamamoto, Gordon, NorthStar, and any affiliates. (*Id.*)

Once again, Plaintiff's allegations that Scheetz entered "one or more" agreements, express or implied, "[f]rom time to time since February 2006," are nearly devoid of factual content. (*Id.*) It appears that the only agreement approximating Plaintiff's description is a Registration Rights Agreement between Morgans and an entity known as NorthStar Partnership, L.P. (*See* Def.'s Mem. 18 (citing Decl. of Howard J. Kaplan, Jan. 14, 2011, Doc. No. 20 ("Kaplan Decl."), Ex. 6).) But the Registration Rights Agreement attached to the motion papers can hardly form the basis for Section 16(b) liability, since neither Scheetz nor any other member of the alleged shareholder group was party to the agreement. (*Id.*)

Faced with the inconvenient fact that no member of the alleged shareholder group signed the Registration Rights Agreement, Plaintiff attempts to create yet another shareholder group, arguing that NorthStar Partnership, L.P. "is itself a shareholder group of which Scheetz, Hamamoto, Gordon, and NorthStar are members." (Pl.'s Opp'n 22.) Plaintiff also claims that NorthStar Partnership, L.P. is a "vehicle" for the alleged shareholder group, such that "any action" by NorthStar Partnership, L.P. "reflects coordinated action" by members of the alleged group. (*Id.* at 23.) But none of these allegations appear in the Complaint itself, which makes no mention of NorthStar Partnership, L.P., alluding instead to unspecified NorthStar "affiliates." (*See, e.g.*, Compl. ¶ 11(iv).) Accordingly, the Court finds Plaintiff's allegations with respect to the Registration Rights Agreements to be wholly insufficient to establish the existence of a shareholder group within the meaning of Section 13(d).

### D. NorthStar and Other Agreements

Finally, Plaintiff also fails to provide factual support for her allegations regarding the "NorthStar Agreements" and "Other Agreements." In each instance, the Complaint alleges that Scheetz, Hamamoto, Gordon, NorthStar, "or its or their affiliates" have entered "one or more agreements, *express or implied*, for the purposes of acquiring, holding, voting, or disposing of issuer securities, including securities issued by [Morgans]." (Compl. ¶ 11(iv-v) (emphasis added).) The allegations with respect to each set of agreements comprise a single, purely conclusory, nearly identical sentence.[3]

With respect to the alleged NorthStar Agreements, Plaintiff again seeks to salvage her claim by going outside the pleadings. To that end, Plaintiff appeals to various SEC filings not mentioned in the Complaint, including a Schedule 13D and an IPO Prospectus which reference NorthStar Partnership, L.P. (Pl.'s Opp'n 16.) For the reasons previously stated, *see supra* Part III.A, these SEC filings are neither incorporated by reference nor "integral" to the pleadings. *See DeLuca*, 695 F. Supp. 2d at 60. Although the Court takes judicial notice of the fact of such filings, it declines to credit the truth of their contents. *See Staehr*, 547 F.3d at 425. Moreover, Schedule 13D simply indicates the identities of the various reporting persons (*i.e.* those investors who have acquired 5% or more of the Company's shares). *See* 17 C.F.R. § 240.13d-1(a). Nothing in Schedule 13D supports an inference that one or more of the reporting persons have entered into an agreement "to act together for the purpose of

---

[3] The "NorthStar Agreements" sentence includes the additional phrase, "in connection with NorthStar's real estate investment business." (Compl. ¶ 11(iv).)

acquiring, holding, voting or disposing of" Morgans securities. 17 C.F.R. § 240.13d-5(b)(1).

By Plaintiff's own admission, the remaining "Other Agreements" are simply a "catch-all" allegation. (Pl.'s Opp'n 23.) The Complaint offers no more than an assertion that the parties agreed, coupled with a "formulaic recitation" of the Section 13(d) standard. *Iqbal*, 129 S. Ct. at 1949. Bare allegations that an unspecified number of parties entered an unspecified agreement at an unspecified time or times are simply insufficient to support an inference that Scheetz controlled more than ten percent of Morgans stock.

***

Taken together, the various "express or implied" agreements alleged in the Complaint fail to plead sufficiently the existence of a shareholder group that would render Scheetz liable under Section 16(b). As noted above, a proper complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. It is not an invitation to a scavenger hunt in which defendants and courts are tasked with unearthing and deciphering clues and omens from assorted documents unmentioned -- or at best barely alluded to -- in the pleadings. A careful inspection of the Complaint here reveals the alleged "Agreements" not as cumulative evidence of liability, but as commingled conclusion and speculation. Such a complaint cannot survive the scrutiny of the federal pleading standard, and must therefore be dismissed.

### E. Leave to Amend

In the final paragraph of her memorandum in opposition, Plaintiff seeks leave to amend the Complaint in the event that the motion to dismiss is granted. (*See* Pl.'s Opp'n 25.) While Rule 15(a) "provides that leave to amend shall be freely given when justice so requires, the Court has broad discretion in deciding whether or not to grant such a request." *DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ. 318 (RJS), 2009 WL 2242605, at *41 (S.D.N.Y. July 27, 2009) (internal citations and quotation marks omitted). A party seeking leave to amend must provide some indication of the substance of the contemplated amendment in order to allow the Court to apply the standards governing Rule 15(a). *See Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004). Absent any indication of the substance of the proposed amendment and in light of the fundamental deficiencies of the existing Complaint, Plaintiff's request to amend the pleadings is denied.

### III. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has failed to plead the existence of a shareholder group, and thus failed to establish Section 16(b) liability. Accordingly, Defendant's motion to dismiss is HEREBY GRANTED. The Clerk of the Court is respectfully directed to terminate the motion located at Doc. No. 19 and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: August 29, 2011
New York, New York

8

***

Plaintiff is represented by James Austen Hunter of Hunter & Kmiec, 150 East 44th Street, No. 9A, New York, New York 10017, and Keenan Douglas Kmiec of Hunter & Kmiec, 111 W. 7th Street, Suite 913, Los Angeles, CA 90015. Defendant Scheetz is represented by Howard Jay Kaplan, Joseph Andrew Matteo, and Stanley Samuel Arkin of Arkin Kaplan Rice LLP, 590 Madison Avenue, 35th Floor, New York, New York 10022. Nominal Defendant Morgans is represented by Dennis H. Tracey III and Robert Brian Black of Hogan Lovells US LLP, 875 Third Avenue, New York, New York 10022.